**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

CYNTHIA T. DOYLE, MOLLIE T. BYRNES, JAMES
WEISS AND DAVID WELBOURN, IN THEIR
CAPACITIES AS TRUSTEES OF THE PETER AND
ELIZABETH C. TOWER FOUNDATION,

                              *Plaintiffs*,                      Civil Action No.  1:22-cv-276

       *-vs-*

                                                     **COMPLAINT**

UBS FINANCIAL SERVICES, INC., JAY S. BLAIR,
and JOHN N. BLAIR,

                              *Defendants.*

Plaintiffs Cynthia T. Doyle, Mollie T. Byrnes, James Weiss and David Welbourn, in their capacities as trustees of The Peter and Elizabeth C. Tower Foundation (the "Foundation"), through their attorneys, Barclay Damon LLP, respectfully allege to the Court as follows:

## PRELIMINARY STATEMENT

    1.     Having insinuated himself into a position of trust and confidence to the Foundation, defendant John Blair spent the next decade and a half enriching himself and his son, defendant Jay S. Blair, at the expense of the Foundation and the underserved people whose support and improvement was at the heart of the Foundation's charitable mission.

    2.     Defendant John Blair hatched a scheme that ultimately resulted in the creators of the Foundation, Peter and Elizabeth C. Tower, placing hundreds of millions of dollars of assets under the investment stewardship of his son, defendant Jay S. Blair.

    3.     The conduct of this father-son tag team since that 2006 transfer has been a tour de force of unethical and unlawful self-dealing, abandonment of fiduciary duties, and obfuscation with regard to the investment accounts managed by defendant Jay Blair.

4.     Almost as incorrigible and unlawful has been the conduct of Jay Blair's employer, defendant UBS Financial Services, Inc. ("UBS"), in countenancing and indeed sanctioning this conduct.

5.     Since amassing control over the Foundation's assets, defendants Jay Blair and UBS have acted with impunity in furtherance of only their own financial interests.

6.     This pattern of abuses ranges from their unwillingness to provide the all members of the Foundation's Investment Committee with quarterly account statements to brazenly refusing the Investment Committee's lawfully-authorized, express direction to transfer the Foundation's assets to a new investment advisor.

7.     Indeed, UBS has refused to permit any of the Foundation's Trustees or its Investment Committee members to take action with respect to the Foundation assets in the UBS investment accounts, except for John Blair, even after knowing that he was removed from his position as Attorney-Trustee of the Foundation by the unanimous consent of all other Foundation Trustees for cause.

8.     As set forth below, the disregard for the Foundation and rank self-interest permeating every action taken by UBS and Jay Blair are the precise abuses the Investment Advisers Act was intended to prevent literally from the time of its adoption in 1940, and both defendants have deviated so far beyond the well-settled standards of loyalty and care owed to an investment advisory client that there can be no other conclusion that this relationship and the underlying investment advisory agreement must be rescinded without delay.

## PARTIES

9.     Plaintiff Cynthia T. Doyle, in her capacity as a Permanent Trustee of the Foundation, one of the three voting members of the Foundation's Investment Committee and the

duly authorized representative of the Investment Committee to effectuate the transfer of the Foundation's assets from UBS to Wilmington Trust, is a domiciliary of the State of Massachusetts, with a permanent residence at 35 South Bowl Road, Chilmark, Massachusetts.  Ms. Doyle's parents founded and funded the Foundation.

10.     Plaintiff Mollie T. Byrnes, in her capacity as a Permanent Trustee of the Foundation and one of the three voting members of the Foundation's Investment Committee, is a domiciliary of the State of Massachusetts, with a permanent residence at 41 Farrington Avenue, Gloucester, Massachusetts.  Ms. Byrnes' parents founded and funded the Foundation.

11.     Plaintiff James Weiss, in his capacity as a Non-Family Trustee of the Foundation, is a domiciliary of the State of Massachusetts, with a permanent residence at 9 Grovedale Road, Oak Bluffs, Massachusetts.  Mr. Weiss is the former superintendent of the Martha's Vineyard public schools, president of the Cape Cod Community College's Graduate Board, and a board member of the Cape Cod Municipal Health Group, and is currently a board member of the Martha's Vineyard Community Foundation.

12.     Plaintiff David Welbourn, in his capacity as a Non-Family Trustee of the Foundation, is a domiciliary of the State of Maine, with a permanent residence at 9 Coveside Lane, Bridgton, Maine.  Mr. Welbourn was the Chief Executive Officer of the Essex County Community Foundation and held senior leadership positions at Bates College, Tufts University, the University at Buffalo Foundation and the University of Vermont, and the Lahey Clinic.

13.     The domiciles of each of the remaining trustees of the Foundation, who are not named parties in this action, are diverse from those of the Defendants, as follows:

        a.     Robert M. Doyle is a Permanent Trustee of the Foundation, and is a domiciliary of the State of Massachusetts, with a permanent residence at 35 South Bowl

24365591.2

Road, Chilmark, Massachusetts.  He is the son-in-law of the founders and husband of Plaintiff Cynthia Doyle.

 b. John H. Byrnes is a Permanent Trustee of the Foundation, and is a domiciliary of the State of Massachusetts, with a permanent residence at 41 Farrington Avenue, Gloucester, Massachusetts.  He is the son-in-law of the founders husband of Plaintiff Mollie Byrnes.

 c. Peter Byrnes is a Family Trustee of the Foundation, and is a domiciliary of the State of Massachusetts, with a permanent residence at 3223 Kirkbride Drive, Danvers, Massachusetts.  His grandparents founded and funded the Foundation and he is the son of Plaintiff Mollie Byrnes and John Byrnes.

 d. Mollie Doyle is a Family Trustee of the Foundation, and is a domiciliary of the State of Massachusetts, with a permanent residence at 49 North Road, Chilmark, Massachusetts.  Her grandparents founded and funded the Foundation and she is the daughter of Plaintiff Cynthia Doyle and Robert Doyle.

 e. Donna Owens is a Non-Family Trustee of the Foundation, and is a domiciliary of the State of Maryland, with a permanent residence at 2423 E. Northern Parkway, Apt. 1A, Baltimore, Maryland.  Ms. Owens is the former City Administrator of Niagara Falls, New York.

14. UBS Financial Services, Inc. ("UBS") is. a business corporation organized and existing under the laws of the State of Delaware, with a principal office for the transaction of business at 1200 Harbor Boulevard, Weehawken, New Jersey.  UBS is a registered broker-dealer and investment adviser (CRD # 8174) with an office at 250 Delaware Avenue, Suite 600, Buffalo,

24365591.2

New York from which it has served as the investment adviser to the Tower Foundation through its employee, Jay S. Blair.

15.    Upon information and belief, defendant Jay S. Blair ("Jay Blair") is a Senior Vice President-Wealth Management of defendant UBS who oversees the relationship between UBS and the Foundation, holding broker-dealer and investment adviser representative licenses (CRD # 3044777), and is domiciled in the State of New York, with a permanent residence at 78 Middlesex Road, Buffalo, New York.

16.    Upon information and belief, defendant John N. Blair is an attorney licensed to practice law in the State of New York and the State of Florida, practicing as a member of The Blair Law Group, LLP, and is domiciled in the State of New York, with a permanent residence at 2591 Love Road, Grand Island, NY.[1]

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the above-captioned action, pursuant to 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy exceeds $75,000.

18.    Venue is proper, pursuant to 28 U.S.C. § 1391.

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims pursuant to the Investment Advisers Act of 1940, 25 U.S.C. § 80b-1 *et seq.*

---

[1] Prior to November 2020, defendant John Blair served as the Attorney Trustee of the Foundation, one of the three voting members of the Foundation's Investment Committee, and he and his law firm have served as counsel for the Foundation.  In November 2020, defendant John Blair was removed for cause as Attorney Trustee of the Foundation by a unanimous vote of all of the other Trustees., *see* Exhibit "D," but has been temporarily reinstated by court order pending the Supreme Court Appellate Division, Fourth Department's review the appeal of the trial court's decision to dissolve the previously issued temporary restraining order and denial of his request for a preliminary injunction. Regardless of the outcome of such pending state court appeal, trial court must rule on a motion to dismiss pleadings filed by defendant John Blair for lack of standing due to such November 2020 removal for cause.

## FACTUAL ALLEGATIONS

20.     The Foundation is a charitable trust that was created by Peter Tower and Elizabeth C. Tower on December 31, 1990, by the execution of a Trust Indenture between Peter Tower and Elizabeth C. Tower, as grantors, and Peter Tower, Elizabeth C. Tower, Mollie Byrnes and Cynthia Doyle, as trustees (the "Original Indenture").  A copy of the Original Indenture is attached as Exhibit "A," and the terms and conditions contained therein are incorporated herein by reference.

21.     The stated purpose of the Foundation is to support organizations involved in the areas of intellectual disabilities, learning disabilities, mental health, and substance use disorders for children and young people in Western New York and Barnstable, Dukes, Essex, and Nantucket Counties in Eastern Massachusetts.

22.     The Original Indenture was amended by instruments dated December 31, 1992, November 1, 1995 and August 1, 1995, and was amended and restated by instruments dated May 4, 2001, May 9, 2006 and June 28, 2006.

23.     While there are two additional amendments and restatements dated February 14/22, 2008 and November 29, 2010, those amendments, by their own terms, only became effective when executed by all of the then-current trustees.  John Blair has asserted that the November 29, 2010 indenture currently governs the operation of the Foundation.  However, upon information and belief, the 2008 and 2010 indentures were not executed by all of the then-current trustees, and thus are ineffective.

24.     Notwithstanding the foregoing, there are no material differences for purposes of this action between the terms of the amended and restated indenture dated June 28, 2006 and the terms of the two so-called subsequent indentures (compare, Exhibit B-1 (the terms and conditions

6

of which are incorporated herein by reference), with Exhibit B-2).  Therefore, the 2010 indenture is hereinafter referred to as the "Operative Indenture."

25.     The Foundation currently has a total of ten Trustees, collectively the "Board" of the Foundation, which is comprised of (i) Cynthia T. Doyle, Mollie T. Byrnes, Robert M. Doyle and John H. Byrnes as Permanent Trustees; (ii) Mollie Doyle and Peter Byrnes as Tower Family Trustees, (iii) Donna Owens, James Weiss and David Welbourn as Non-Family Trustees; and (iv) defendant John Blair as Attorney Trustee, notwithstanding his removal by all other Trustees for cause, as set forth herein.

26.     All of the trustees of the Foundation with the exception of defendant John Blair have executed a certain document entitled, "Resolution Authorizing the Board and its Attorneys to Take All Necessary Action to Commence Litigation in Federal Court Against UBS Global AG, Its Affiliates and Subsidiaries, John N. Blair and Jay S. Blair to Effectuate the Majority Vote of the Investment Committee to Terminate Current Investment Advisor, Retain Wilmington Trust Investment Advisors, Inc. as the Investment Advisor of The Peter and Elizabeth C. Tower Foundation, and Seek Appropriate Damages and to Commence FINRA Arbitration Against UBS Global AG, its Affiliates and Subsidiaries, and Jay S. Blair to Seek Similar Relief," (the Litigation "Resolution"), dated April 8, 2022.  A copy of the Resolution is attached as Exhibit "C," and the terms and conditions contained therein are incorporated herein by reference.

27.     Pursuant to the Amendment and Restatement of the Original Indenture dated May 9, 2006 (the "Fourth Indenture"), which was drafted by defendant John Blair, as the Foundation's legal counsel, the position of "Attorney Trustee" was created, and defendant John Blair was appointed to serve as the Attorney Trustee of the Foundation.

28.     By an amendment and restatement of the Foundation's Indenture in May of 2006, Mr. Blair was appointed as the Attorney Trustee of the Foundation and, with that appointment, became one of the three voting members of the Foundation's Investment Committee and counsel to the Foundation.

29.     Defendant John Blair was removed, in accordance with the terms of the Operative Indenture, as Attorney Trustee, for cause, in November of 2020 by unanimous vote of the Trustees as well as their adoption and approval of a certain document titled, "Unanimous Vote of the Trustees of the Foundation to Remove John N. Blair as Attorney Trustee and the Breaches of Fiduciary Duty Supporting the Removal of John N. Blair as Attorney Trustee of the Foundation." ("Removal Resolution.")  See Exhibit "D."

30.     Under the Fourth Indenture, the Foundation eliminated the position of the "Investment Trustee," and vested the responsibilities of the Investment Trustee in an Investment Committee, to oversee the investment and management of the assets of the Foundation.

31.     At present, the Investment Committee is comprised of three voting members, Cynthia Doyle, Mollie Byrnes and the Attorney Trustee.

32.     In a letter to his daughters, Cynthia Doyle and Mollie Byrnes, dated February 14, 2008, Peter Tower stated his intention in creating the Investment Committee, stating that it was "carefully structured to place [Cindy Doyle and Mollie Byrnes], with John's assistance, in a position to always maintain investment and operational control" of the Foundation.  See Exhibit "E."

33.     Upon information and belief, Defendant John Blair was described by Peter Tower's private office manager as visiting with Peter Tower frequently and brought with him documents prepared for Peter Tower to sign, which Peter Tower did sign.  Upon information and belief, among

8

the papers that defendant John Blair brought to Peter Tower was information about an investment firm, Smith Barney, with which defendant John Blair's son, defendant Jay S. Blair, was associated. Jay Blair was employed by the Arthurs Malof Group which was then affiliated with Smith Barney.

34.     Upon information and belief, defendant John Blair repeatedly suggested that his son should be appointed as investment adviser over the Foundation's investments, which were at that time being handled by Whitegate Investment Counselors (Carl Erickson).

35.     Upon information and belief, Peter Tower expressed concern about doing so, but ultimately acquiesced to move the Foundation's investments to Smith Barney to be handled by the Arthurs Malof Group within the Buffalo office of Smith Barney and with which Jay Blair was then affiliated.

36.     In connection with that decision, defendant John Blair drafted a Statement of Unanimous Consent in Lieu of Meeting of Voting Members of the Investment Committee dated August 2, 2006, whereby only he and Peter Tower were authorized to write checks and take certain actions with respect to the Foundation's accounts (the "2006 Investment Committee Consent.") See Exhibit "F."

37.     Upon information and belief, for months after agreeing to retain Smith Barney and designate defendant John Blair as the authorized representative of the Investment Committee, Peter Tower expressed a great deal of frustration regarding this, particularly because of the lack of transparency.

38.     Thereafter, on March 31, 2007, the Board of the Foundation implemented a Conflict of Interest policy, requiring that, "[b]efore participating in any action or decision of the Foundation affecting any organization of which or in which the Foundation Trustee or employee, or any member of his or her family, is an officer, director, trustee or employee or holds another

24365591.2

responsible position, such person shall disclose such fact to the Board."  A copy of the Conflicts of Interest Policy is attached as Exhibit "G," and the terms and conditions contained therein are incorporated herein by reference.

39.     The Board of the Foundation also implemented a Self-Dealing Policy on March 31, 2007, which prohibits the Foundation from engaging "in any transaction that will result in any material financial or personal benefit to any Trustee or Foundation employee."  A copy of the Self-Dealing Policy is attached as Exhibit "H," and the terms and conditions contained therein are incorporated herein by reference.

40.     On December 4, 2008, defendant John Blair prepared a Revised Investment Committee Charter, which delineated the responsibilities of the Investment Committee, including setting investment policies and guidelines, overseeing investment and reinvestment of the funds of the Foundation, monitoring the management of funds, and evaluating investment performance. A copy of the Revised Investment Committee Charter is attached as Exhibit "I," and the terms and conditions contained therein are incorporated herein by reference.

41.     Among its various responsibilities, the Investment Committee has "the power to retain and compensate one or more advisors to assist the Investment Committee in performing its responsibilities."  See Ex. I at art. II.

42.     Pursuant to the express terms of the Revised Investment Committee Charter, in order to be valid, any actions by the Investment Committee "require the vote or written consent (manual or electronic) of a majority of the voting Members of the Investment Committee except that unanimous vote or written consent of all of the voting members of the Investment Committee shall be required to amend, modify, change or waive any provision of the Investment Policy Statement and/or the Investment Committee Charter."  See Ex. I at art. IV.

43.     On November 29, 2010, defendant John Blair prepared and the Investment Committee adopted an Investment Policy Statement, which notes that all of the members of the Investment Committee "are fiduciaries and are responsible for directing and monitoring the investment management of the assets" of the Foundation.     A copy of the Investment Policy Statement is attached as Exhibit "J," and the terms and conditions contained therein are incorporated herein by reference.

44.     Upon information and belief, thereafter, in or about 2009, Morgan Stanley purchased Smith Barney from Citigroup, becoming Morgan Stanley-Smith Barney until ultimately the merged entities were known as "Morgan Stanley."

45.     Upon information and belief, Defendant Jay Blair and his team, the Arthurs Malof Group, became affiliated with Morgan Stanley.

46.     Upon information and belief, defendant John N. Blair failed to adhere to the Foundation's policies or procedures in improperly determining to move the Foundation's investment advisory accounts to Morgan Stanley.  By doing so, he ensured his son's continued financial benefit as the investment advisor of the Foundation's significant assets at the Foundation's expense.

47.     Despite repeated requests from Investment Committee members Cynthia Doyle and Mollie Byrnes, defendant John Blair, who was then the Attorney Trustee and legal counsel for the Foundation, drafted and maintained many of the Foundation's records, failed and/or refused (and continues this failure and/or refusal) to provide proof that the decision to continue the Foundation's investment management through Morgan Stanley was put to a vote and approved by a majority of the voting members of the Investment Committee.

48.     Elizabeth C. Tower passed away on May 2, 2013 and Peter Tower passed away on February 5, 2014.

49.     In 2015, defendant Jay Blair and his team, the Arthurs Malof Group, moved from Morgan Stanley to UBS where they are currently registered Investment Adviser Representatives.

50.     Defendant John Blair determined, without authority from the Investment Committee, without conducting due diligence on UBS, and without taking a vote on the issue, that the Foundation would terminate Morgan Stanley and retain UBS as the Foundation's investment advisor.   By doing so, he, once again, ensured his son's continued financial benefit as the investment advisor of the Foundation's significant assets to the detriment of the Foundation.

51.     In derogation of the Investment Committee's express policies and voting requirements, defendant John Blair made this determination unilaterally notwithstanding his conflict of interest.

52.     Despite repeated requests by the Investment Committee members and Trustees, defendant John Blair has steadfastly refused to provide proof that the decision to terminate Morgan Stanley and retain UBS as the Foundation's investment advisor was put to a vote and approved by a majority of the voting members of the Investment Committee in advance of the decision to terminate Morgan Stanley.

53.     Upon information and belief, defendant John Blair's campaign to usurp the authority and prerogatives of the Investment Committee only escalated once he unilaterally terminated the Foundation's advisor and retained UBS.

54.     By way of illustration and not limitation, defendant John Blair identified only himself as trustee of the Foundation on documentation submitted to UBS to establish the Foundation's investment accounts.

12

55.     Underlining his intent to keep the Foundation's assets with his son's firm at all costs, defendant John Blair further knowingly and falsely stated on the account opening paperwork that he was "not related to an employee of UBS AG, its subsidiary or affiliates."  See Exhibit "K."

56.     Upon information and belief, defendant John Blair executed all of the agreements between the Foundation and UBS, purportedly under the authority of the 2006 Investment Committee Consent.  *See* Ex. F.

57.     However, the "2006 Investment Committee Consent" predated and was superseded by the Conflict of Interest Policy, Self-Dealing Policy and Revised Investment Committee Charter.

58.     Upon information and belief, UBS and defendant Jay Blair failed to conduct any diligence into defendant John Blair's authority to act for and bind the Foundation.  Upon further information and belief, UBS and defendant Jay Blair accepted paperwork signed by defendant John Blair stating that he was not related to an employee of UBS notwithstanding actual knowledge that defendant John Blair made a false statement.

59.     Had either UBS or defendant Jay Blair acted with even minimal diligence in the account opening process, they would have easily discovered that the 2006 Investment Committee Consent had been superseded and that defendant John Blair was without authority to act independently, the existence of clear policies in place to prevent the type of conflict of interest that defendant John Blair was operating under, and the Revised Investment Committee Charter that expressly set forth the requirements for approving any change in investment advisors.

60.     Instead, UBS and defendant Jay Blair utterly failed to determine whether defendant John Blair was lawfully acting on behalf of the Foundation and instead transacted directly, and exclusively, with defendant John Blair.

61.     Upon information and belief, in addition to moving the Foundation's assets to Smith Barney/Morgan Stanley and UBS, defendant John Blair designated himself as the sole point of contact with the Arthurs Malof Group, excluding the Foundation's other Trustees, including the two other voting members of the Investment Committee, plaintiffs Cynthia Doyle and Mollie Byrnes, notwithstanding Peter Tower's intent that his daughters always maintain investment and operational control of the Foundation.

62.     Requests for information made by trustees other than defendant John Blair concerning the Foundation's investments went unanswered by UBS and defendant Jay Blair based on the claim that they were only authorized to discuss the Foundation's investments with defendant John Blair despite the fact that UBS and defendant Jay Blair, as investment advisor and investment advisor representative to the Foundation, owed the other trustees and Foundation, not just defendant John Blair, a fiduciary duty of loyalty and care.

63.     Among other things, neither UBS or either Blair defendant has produced or shown the other Trustees regular statements for the Foundation's accounts or the underlying investment advisory contract purportedly made by the Foundation and UBS.

64.     This lack of information interfered with plaintiffs Cynthia Doyle and Mollie Byrnes' ability to fulfill their fiduciary duties to the Foundation under New York law, which duties are set out in the Investment Policy Statement.  *See* Ex. I.

65.     In fact, the only relevant contract in the Foundation's possession is a document titled "UBS Relationship Agreement" signed by defendant John Blair on September 3, 2015— ("UBS Relationship Agreement"), representing himself as the sole trustee to the Foundation; that Relationship Agreement expressly provides that it applies to all UBS accounts opened by the Foundation., which is attached as Exhibit "L."

14

66.     In part as a result of this lack of communication and transparency from the defendants, in June of 2020, plaintiffs Cynthia Doyle and Mollie Byrnes, two of the three voting members of the Investment Committee, called for a meeting of the Investment Committee to vote on initiating the process of "interviewing the current investment advisor and potential alternative investment advisors." *See* Exhibit "M."

67.     Under the Conflict of Interest Policy, and as a fiduciary to the Foundation, defendant John Blair was required to abstain from the investment advisor selection process because it created a clear conflict between his duties to the Foundation and his personal interest in having his son's firm remain the Foundation's investment advisor.

68.     Defendant John Blair did not abstain from any part of the process.

69.     To the contrary, defendant John Blair continued to (improperly) hold himself out as the sole decision maker on the retention of investment advisors for the Foundation, insisting that there was no basis for considering whether to retain an investment adviser other than UBS and touting UBS's alleged accomplishments, while also withholding access to information from UBS.

70.     Notwithstanding defendant John Blair's stated disapproval of the Foundation's decision to seek alternative investment advisors, requests for proposals were sent to fourteen firms and twelve responses were received, each of which were reviewed by the Investment Committee. Four firms were selected for follow-up interviews, including UBS.

71.     After interviewing the final four candidates, the Investment Committee met twice to choose among the four remaining firms, during which time defendant John Blair continued to delay a vote, and misrepresented, distracted and provided misinformation (either directly or through third parties, including the Foundation's accountants) regarding the fees charged by UBS as compared to the fees to be charged by each of the candidate investment firms.

15

72.     On September 17, 2020, a vote of the Investment Committee was held as provided under the Revised Investment Committee Charter.

73.     Rather than recuse himself under the Foundation's Conflict of Interest Policy and uphold his fiduciary obligations to the Foundation, defendant John Blair voted to retain UBS; however, a majority of the voting members of the Investment Committee voted to terminate UBS and retain Wilmington Trust Investment Advisors, Inc. ("Wilmington Trust").

74.     Since September of 2020, the Foundation has taken steps to transfer the investment funds from UBS to Wilmington Trust, including the retention of independent counsel (Bousquet Holstein PLLC, Lawrence Bousquet, Esq.) to negotiate the Wilmington Trust investment management agreement and prepare the transfer paperwork on behalf of the Investment Committee.

75.     Attorney Bousquet engaged in a lengthy and thorough due diligence process with Wilmington Trust on behalf of the Foundation.

76.     Defendant John Blair participated in all aspects of the due diligence and negotiations process with Wilmington Trust.

77.     In fact, defendant John Blair provided detailed comments on the Investment Management Agreement with Wilmington Trust.  Those comments were reviewed by Attorney Bousquet and discussed with the Investment Committee.

78.     However, during those negotiations, defendant John Blair continued to frustrate the process.  Among other actions, defendant John Blair repeatedly and falsely represented to the Foundation and Investment Committee that the management fees charged by UBS under the investment advisory contract were lower than those proposed by Wilmington Trust, when in fact the overall fees charged by UBS were substantially higher.

79.    The transfer paperwork, including an Investment Management Agreement and a Custody Agreement, was circulated to all members of the Investment Committee, including defendant John Blair, on November 22, 2021.

80.    Over a period of three months thereafter, defendant John Blair interfered in the process of finalizing the agreements between the Foundation and Wilmington Trust.

81.    On December 14, 2021, defendant John Blair and his attorneys, among other things, claimed that "the Foundation did not have the authority to execute the Investment Management Agreement and related documents, and therefore transfer all of its investment assets from UBS to Wilmington, over Mr. Blair's objection as Attorney Trustee and Chair of the Operations and Investment Committees."  They further claimed that his issue was currently before the Surrogate's Court; it is not.  See Exhibit "N."

82.    Notably, defendant John Blair cited to the very governance documents that are described above for his baseless assertion that his consent is required to transfer the assets from UBS to Wilmington Trust.  *See id.*

83.    Defendant John Blair claimed that the transfer was not authorized because the retention of UBS was directed by Peter Tower (*see id.*), when in fact Peter Tower was dead at the time the Foundation's assets were transferred to UBS.

84.    Defendant John Blair falsely claimed that "the Arthurs Malof Group was re-appointed when it became affiliated with UBS in 2015, with the written approval of all voting members of the Investment Committee[,]" citing a Statement of Unanimous Consent in Lieu of Meeting dated Sept. 23, 2015.  Id.

85.    The certain document titled, "Statement of Unanimous Consent in Lieu of Meeting," dated Sept. 23, 2015 in fact shows that defendant John Blair unilaterally terminated

24365591.2

Morgan Stanley and executed documents necessary to open investment accounts at UBS, and only after taking those unauthorized actions did he even notify and seek the approval of the Investment Committee a full 20 days later.  See Exhibit "O."

86.     On information and belief, defendant John Blair has not signed the Foundation's annual conflict disclosure form since 2015.  In fact, the only conflict disclosure that John Blair signed was in 2015, and defendant John Blair has refused to provide any updates or information regarding his continued conflicts of interest relating to the Foundation's historical choice of investment adviser.

87.     Notwithstanding defendant John Blair's interference with the process, the transfer paperwork was finalized and a meeting of the Investment Committee to approve the transfer documents was scheduled for February 24, 2022; however, the meeting was adjourned at the request of defendant John Blair.

88.     That same day, the transfer paperwork was again sent to Investment Committee with minor revisions to those documents noted in the substance of the transmittal email.

89.     The only new document was the two-page Certificate of Authority that was drafted to address defendant John Blair's objections to the indemnification language.

90.     A meeting of the Investment Committee to review the transfer paperwork and to identify an authorized Trustee to execute the transfer paperwork was scheduled for March 4, 2022.

91.     Defendant John Blair attempted to cancel the Investment Committee meeting on March 4, 2022, claiming that its purpose was to hold a vote to terminate UBS as the Foundation's investment advisor. This was false, as UBS had been terminated by vote of the Investment Committee in September 2020.

92.   Defendant John Blair also attempted to cancel the March 4, 2022 meeting by implausibly claiming that he did not have sufficient time to review the transfer paperwork, notwithstanding that he was provided that transfer paperwork more than three months earlier and that his counsel had weighed in regarding his (incorrect) position regarding claims of authority directly to general counsel's office of Wilmington Trust.

93.   At the March 4, 2022 meeting of the Investment Committee, at which Attorney Bousquet acting as the Foundation's counsel was present, a majority of the voting members of the Investment Committee voted in favor of the following resolutions, which were then included in a Certificate of Authority executed by Cynthia T. Doyle (*see* Exhibit "P"):

> RESOLVED, that the Client hereby authorizes Cynthia Doyle (the "Authorized Officer"), in the name and on behalf of the Client, to complete, execute and deliver to the Global Capital Markets division of M&T Bank or any subsidiary or affiliate thereof, including, but not limited to, Wilmington Trust, National Association (collectively, "M&T Bank") the below-listed agreements, in a form acceptable to such Authorized Officer, for the provision of custody, funds transfer, investment management and investment advisory services:
>
> 1.   Tower PE Fdn RICS (Custody) - Combined KYC Onboarding Package to be signed by the Client;
>
> 2.   Institutional Custody Services Account Application and Agreement to be signed by the Client;
>
> 3.   Investment Management Agreement (Non-ERISA) with the following attached:
>
> Schedule A - Fee Schedule for Investment Management Agreement,
>
> Schedule B - Client=s Initial Custodian Name and Contact Details,
>
> Schedule C - WILMINGTON TRUST INVESTMENT ADVISORS, INC. MUTUAL FUND DISCLOSURE AND CONSENT INVESTMENT MANAGEMENT ACCOUNT AGREEMENT,
>
> Exhibit 1(a): Investment Policy Statement,
>
> Exhibit 1(d)-1: Holdings of the Client with its prior advisor, and
>
> Exhibit 1(d)-2: PECTF - Proposed Lineup Based on Current IPS;
>
> 4.   Custody Agreement between Client and Wilmington Trust, N.A.;
>
> 5.   Institutional Custody Fee Schedule between Client and Wilmington Trust, N.A.;
>
> 6.   This Certificate of Authority to be signed by a Trustee of the Client;

24365591.2

7.     Certificate of Incumbency to be signed by a Trustee of the Client;

8.     Form W-9 to be signed by the Client;

9.     Funds Transfer Agreement between the Client and Wilmington Trust naming Authorized Instructor and Authorized Confirmer;

10.    FTA Election Form to be signed by the Client;

11.    Account Transfer Form 16769, to include the Client=s most recent statement from UBS Financial Services Inc. to be signed by the Client;

12.    Account Transfer Form 16770, to include the Client=s most recent statement from UBS Financial Services Inc. to be signed by the Client; and

13.    Client Online Election Form.

RESOLVED, that each such Authorized Officer, or any one of them, in the name and on behalf of the Client, may complete, execute and deliver any amendments and agreements or other documents related thereto and to execute or effect transactions under and give notices, certifications and instructions with respect to such agreements, as such Authorized Officer deems necessary or appropriate from time to time; and it is further

RESOLVED, that Client hereby ratifies and confirms all actions taken by it prior to the date hereof in connection with such agreements executed and delivered to M&T Bank; and it is further

RESOLVED, that the Authorized Officers are, and each of them is, hereby authorized to designate from time to time the accounts subject to such agreements, and designate from time to time the individuals who may execute or effect transactions under and give notices, certifications and instructions with respect to such agreements, such individuals designated as "Authorized Representatives;" and it is further

RESOLVED, that M&T Bank be and hereby is authorized to rely on the actual or purported signatures of any of Client's Authorized Officers and Authorized Representatives. Until M&T Bank has actually received and had a reasonable time to act on written notice from Client revoking such authority; M&T Bank shall be entitled to rely on the authority granted herein; and it is further

RESOLVED, that these resolutions supercede all prior resolutions on the subject to which they pertain, and shall remain in full force and effect and binding upon Client until M&T Bank has actually received and had a reasonable time to act on any subsequent Certificate of Authority; provided, that these resolutions are limited in application to the services specified herein provided by the Global Capital Markets division of M&T Bank and do not supercede or affect in any way the continuing validity of other resolutions provided to M&T Bank in regard to accounts that are serviced or services that are provided by any other division or department of M&T Bank, including but not limited to accounts and services provided by Commercial Deposit Services and Treasury Management Services.

94.     Defendant John Blair insisted that he personally send these documents to UBS to begin the process of transferring the Foundation's assets to Wilmington Trust.

95.     Since the March 4, 2022 meeting of the Investment Committee, defendant John Blair has interfered in the transfer of assets by, *inter alia*, delaying the Foundation's accountants from providing the list of assets of the Foundation, including UBS statements and the cost basis of the investments (which was an exhibit to the Certificate of Authority), so that the assets can be

20

efficiently transferred from UBS to Wilmington Trust, by claiming that only he, as the Chair of the Investment Committee was authorized to handle such requests.

96.     Defendant UBS has also obstructed the transfer of the Foundation's assets, in clear opposition to the lawful and binding determination by the Investment Committee that the Foundation's best interests were served by transferring investment management responsibility to Wilmington Trust.

97.     In particular, UBS refused (and as of the date of this Complaint, has continued to refuse) to accept the transfer paperwork executed by plaintiff Cynthia Doyle, taking the position that it will not transfer the Foundation's assets to Wilmington Trust without the consent of defendant John Blair referring to the Statement of Unanimous Consent in Lieu of Meeting of Voting Members of the Investment Committee dated August 2, 2006. See Exhibit "Q" attached hereto.

98.     The 2006 Investment Committee Consent merely authorizes defendant John Blair to take certain actions, but does not give him the exclusive right to do so.  In addition, that Resolution was superseded by subsequent governance documents, including the Conflict of Interest Policy, Self-Dealing Policy, Revised Investment Committee Charter and Investment Policy Statement, which authorized the Investment Committee by a majority vote to approve the execution of the Certificate of Authority dated March 4, 2022, nominating plaintiff Cynthia Doyle as the representative of the Investment Committee authorized to execute the transfer paperwork. *See* Exhibit N.

99.     UBS and/or defendant John Blair have also taken the position that the transfer of the Foundation's assets to Wilmington Trust violates terms of a purported investment advisory

24365591.2

agreement allegedly entered into between the Foundation and UBS, a document which they have refused to turn over to the Foundation, their investment advisory client, despite repeated requests.

100.    On March 8, 2022, defendant John Blair continued his scheme to prevent the Foundation from moving its investments from his son's control at UBS.  He asserted that moving forward with a transfer of the Foundation's assets would subject the voting members of the Investment Committee to "liability risk."  This was an obvious attempt to threaten plaintiffs Cynthia Doyle and Mollie Byrnes should they proceed with the transfer in the face of defendant John Blair's claims that his approval was necessary before assets could be transferred from UBS to Wilmington Trust.

101.    A meeting was scheduled between the operations team at UBS and the operations team at Wilmington Trust for March 24, 2022 at 2:00pm, the purpose of which was to discuss the method of effectuating the transfer of the Foundation's assets pursuant to the direction and resolution of the Investment Committee.

102.    Upon information and belief, Defendant Jay Blair, or a member of his group, in an attempt to circumvent the Board's lawful exercise of its authority and in direct contradiction to the Foundation's expressed interests, received and forwarded the meeting planner to defendant John Blair (and a litigation associate employed by defendant John Blair's firm who has had no previous involvement in the Foundation's Investment Committee meetings), but not to the rest of the Investment Committee members.  The meeting planner invitation was accepted by defendant John Blair and his employee.

103.    When confronted with his acceptance and intention to attend and potentially interfere with this meeting between two financial institutions regarding logistical issues, defendant John Blair (through his counsel) denied that he ever intended to participate in the meeting.

22

104.     None of the defendants provided the other Investment Committee members with notice of such meeting.

105.     Since that time, Thomas Waters, a representative of Wilmington Trust leading the Foundation's onboarding process, has attempted to communicate with UBS to facilitate the transfer of the Foundation's assets.

106.     Robert Swanson, the Buffalo, New York Branch Manager of UBS, reached out for confirmation from plaintiffs Cynthia Doyle and Mollie Byrnes that he could contact Mr. Waters of Wilmington Trust, directly, which confirmation was provided on April 5, 2022.

107.     In a return call on April 6, 2022 with plaintiffs' counsel, Jennifer G. Flannery, Esq., Mr. Swanson claimed that UBS would only review transfer instructions from those who are authorized, implying that UBS rejected plaintiff Cynthia Doyle and the Investment Committee's authority in direct opposition to the unambiguous governance documents that UBS was obligated to understand and to its obligation to serve the Foundation's best interests.  Mr. Swanson did not explain why the authorization that UBS had received from the Foundation was insufficient.

108.     On April 8, 2022 plaintiffs' counsel, Jennifer G. Flannery, Esq., wrote to defendant UBS general counsel's office inquiring as the legal basis claimed by defendant UBS to prevent the transfer of the Foundation's assets to Wilmington Trust. As of the date of this Complaint, no response has been received.

109.     On April 7, 2022, a representative of UBS contacted Mr. Waters of Wilmington Trust and advised that UBS would not be transferring the Foundation's assets without the consent of defendant John Blair.

## COUNT ONE
## RESCISSION OF THE UBS ADVISORY AGREEMENT AND RESTITUTION OF FEES
### (As to UBS)

110.    Plaintiffs repeat and reallege Paragraphs 1 through 109 as if fully set forth herein.

111.    Pursuant to Section 215(b) of the Advisors Act, "[e]very contract made in violation of [the Act], the performance of which involves the violation of, or the continuance of any relationship in practice in violation of any provision of [the Act], or any rule, regulation, or thereunder, shall be void."

112.    In other words, if the terms of an unlawfully-entered investment advisory contract would violate Section 206, or continue a relationship improperly entered into, that contract is subject to rescission under Section 215.

113.    When an investment advisory agreement is rescinded pursuant to Section 215, the rescinding party is also titled to restitution of fees paid under the contract.

114.    During the period from 2015 through present, defendant UBS served as an "investment adviser" to the Trust, as that term is defined in the Investment Advisers Act of 1940.

115.    Under New York law and the terms of the operative Indenture, management of the Trust's assets is effectuated through actions approved by a vote of the Investment Committee.

116.    UBS and defendant Jay Blair were required to ascertain that the Investment Advisory Contract was duly authorized under the operative Indenture and pursuant to the Trustees' direction.

117.    Instead, defendant UBS and defendant Jay Blair disregarded their own policies and procedures, as well as their statutory and regulatory requirements, by failing to ensure the legal authority for entering into the investment advisory contract with the Trust.

118.    Defendant John Blair executed the documentation opening the investment advisory accounts with UBS on September 3, 2015.

119.    At that time, the Trust had not authorized or approve entering into the investment advisory contract with defendant Jay Blair and UBS.

120.    Accordingly, notwithstanding any post-hoc ratifications, assuming *arguendo*, that a ratification could even be made without adequate disclosure, by the Trustees of defendant John Blair's conduct, the contract was an *ultra vires* act at the time of its execution.

121.    Further, UBS had knowledge, through defendant Jay Blair, of the Foundation's other nine trustees and that the Investment Committee's approval was necessary to open accounts for the Foundation and transfer its assets to UBS.

122.    Because UBS knew of the Foundation's nine additional Trustees, UBS was required to, and did not, obtain an executed Trustee Certification from each of the nine additional Trustees.

123.    Because UBS knew about the nine additional trustees and the Investment Committee approval requirements, through defendant Jay Blair, the investment advisory contract was obtained by UBS through conduct in violation of Section 206(2) of the Advisors Act and is thus void under Section 215 of the Act.

124.    In the alternative, if the investment advisory contract is deemed validly entered, it is still subject to rescission because performance under that agreement violates and will continue to violate the fiduciary duty imposed on all advisors and advisor representatives under Section 206 of the Advisors Act.

125.    UBS and defendant Jay Blair have violated Rule 206 of the Advisors Act during the term of the agreement through their complete and utter disregard to the needs and interests of their client, the Foundation, specifically including by:

      a.    Engaging in conflicted transactions or failing to avoid conflicts by refusing to transfer the Trust's accounts and assets to Wilmington Trust but instead retaining the Trust's assets and continuing to assess advisory fees;

      b.    Refusing to communicate or provide information to the Foundation's lawfully-authorized trustees over a period of nearly seven years in furtherance of a scheme to ensure that defendants Jay Blair and John Blair controlled every aspect of the investment advisory relationship with the Foundation in a manner that guaranteed their continued control over its assets; and

      c.    Failing to obtain a verification of client funds under custody annually and failing to provide account statements to the Trust on at least a quarterly basis. 15 U.S.C. § 80b-6 and 17 C.F.R. § 275.206(4)-2.

126.    The investment advisory contract is also void because it purports to waive UBS's fiduciary duties to the Foundation and specific obligations it owes to the Foundation by operation of the incorporated Relationship Agreement, which UBS states applies to all accounts held at UBS, regardless of account type.

127.    For example, the UBS Relationship Agreement purports to disclaim "any breach of fiduciary duty for account activities and transactions that are not specifically identified in this certification as a limitation on your authority to invest or act on behalf of the trust."

26

128.    UBS also purports to limit its fiduciary duties by disclaiming any duty to inquire as to the propriety of transactions in the Foundation's accounts and requiring indemnification for account losses arising from those potentially unauthorized transactions.

129.    UBS's attempts to improperly waive or disclaim its fiduciary duties are void under the Advisors Act, because, according to the SEC "an adviser's federal fiduciary obligations are enforceable through section 206, [the SEC] would view a waiver of enforcement of section 206 as implicating section 215(a) of the Advisers Act. . ." and inconsistent with the Advisers Act's core obligations.[2]

130.    Accordingly, the Trust is entitled to an order rescinding the UBS Relationship Agreement, as well as any operative investment advisory contract between UBS and the Foundation, and awarding restitution in the amount of its advisory fees paid to UBS and defendant Jay Blair under the advisory contract.

## COUNT TWO
## BREACH OF FIDUCIARY DUTY (DUTY OF CARE)
### (as to UBS and Jay S. Blair)

131.    Plaintiffs repeat and reallege Paragraphs 1 through  109 as if fully set forth herein.

132.    During the period from 2015 through present, UBS served as an "investment adviser" to the Trust, as that term is defined in the Investment Advisers Act of 1940.

133.    Under Section 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6, an investment adviser and the representatives of an investment advisers owe clients a fiduciary duty of care and utmost loyalty in acting on their behalf.

---

[2]    Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Release No. IA-5248, at 9-10, n. 29 & 30.

134.    A fiduciary duty coextensive with that owed under the Advisers Act is also recognized under New York law.

135.    An investment adviser and its representatives are required to exercise a duty of care that includes a responsibility to ensure that the Adviser makes a reasonable investigation "to verify that its management of the account is not based on "materially inaccurate or incomplete information."

136.    UBS failed to satisfy that duty of care when it accepted the account opening documents from defendant John Blair that, among other inaccuracies, falsely stated that defendant John Blair was the sole trustee for the Foundation, a fact UBS knew or should have known false by virtue of its agent defendant Jay Blair's long-term relationship with the Foundation as its investment adviser representative.

137.    On or about November 24, 2020, the nine disinterested Trustees unanimously removed defendant John Blair as Attorney Trustee for cause, stripping him of any authority to act on behalf of the Trust and invalidating any authority he may have held with respect to management of the Trust's assets.

138.    Notwithstanding the temporary restraining order and preliminary injunction, the very fact that defendant John Blair was  removed and that it was disputed was material to the management of the account and UBS had a duty to make a reasonable investigation to verify that the ostensible basis for defendant John Blair's authority remained valid as soon as it learned of the November 2020 vote.

139.    Further, UBS and defendant Jay Blair knew or should have known that defendant John Blair had been removed as Attorney Trustee and that his authority to direct the management of the Trust's accounts had terminated.

140.     UBS failed to satisfy its duty of care to the Trust by failing to make reasonable investigations necessary to verify the person or persons authorized to direct the management of the Trust's accounts.

141.     This breach was especially egregious because defendant Jay Blair had been the investment adviser representative to the Foundation since 2006 and therefore should have been intimately familiar with the interests and requirements of this longtime client.

142.     UBS further failed to satisfy its duty of care to the Foundation by relying on a nine-year old resolution purporting to authorize defendant John Blair to direct  the management of the Foundation's accounts despite the fact that UBS, through Malof Group and defendant Jay Blair, knew or should have known that the Foundation's operative governance documents had been amended several times thereafter, including by creating the Investment Committee.

143.     In particular, UBS's reliance on the 2006 Resolution as the basis to refuse the lawful direction of the Trust and Trustees to transfer the Trust's assets to Wilmington Trust breached its duty of care because UBS and defendant Jay Blair failed to make a reasonable investigation into defendant John Blair's authority to prevent that transfer despite being advised of defendant John Blair's termination from his role as Trustee to the Foundation.

144.     The Trust was injured as a result of this breach in being forced to pay UBS's and defendant Jay Blair's substantially inflated advisory fees and being refused the ability to actively manage the Trust's assets.


**COUNT THREE**
**BREACH OF FIDUCIARY DUTY (DUTY OF LOYALTY)**
**(As to UBS and Jay S. Blair)**

145.     Plaintiffs repeat and reallege Paragraphs 1 through 109 as if fully set forth herein.

146.    Defendant Jay Blair and UBS compounded their egregious breaches of their fiduciary duties throughout the relationship with the Foundation by acting in accordance with their own, not the Foundation's, best interests.

147.    Under Section 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6, an investment adviser and the representatives of an investment advisers owe clients a fiduciary duty of care and utmost loyalty in acting on their behalf.

148.    A fiduciary duty coextensive with that owed under the Advisers Act is also recognized under New York law.

149.    As investment advisors and fiduciaries, UBS and defendant Jay Blair owed the Trust a duty of undivided and undiluted loyalty that required UBS and defendant Jay Blair to avoid situations in which their interests might conflict with the interests of the Foundation.

150.    The disinterested members of the Investment Committee expressly voted unanimously to direct UBS and defendant Jay Blair to close its accounts and transfer the Foundations assets to accounts being opened at Wilmington Trust.

151.    UBS and defendant Jay Blair acted in direct opposition to the Foundation's interests and placed their interests in collecting substantial, undeserved advisory fees from the Trust for unlawfully "managing" the Foundation's assets before the best interests of the Foundation.

152.    In so doing, UBS and defendant Jay Blair placed their own personal and pecuniary interests before the Foundation's expressly-stated interests.

153.    In so doing, UBS and defendant Jay Blair breached their duty of loyalty, and thus their fiduciary duty, to the Trust.

154.    The Trust has been damaged by this ongoing breach of UBS and defendant Jay Blair's fiduciary duties to the Trust by being forced to pay undeserved, substantial advisory fees.

155.    UBS and defendant Jay Blair are liable for these damages.

## COUNT FOUR
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (as to John N. Blair)

156.    Plaintiffs repeat and reallege Paragraphs 1 through 109 as if fully set forth herein.

157.    As the Investment Adviser to the Trust, UBS had a fiduciary duty of care and utmost loyalty to the Trust under Section 206 of the Investment Advisers Act and under New York law.

158.    Under New York law, a person aids and abets the breach of a fiduciary duty where that person knows of a fiduciary duty that has been breached and provides substantial assistance to the person or entity breaching that fiduciary duty.

159.    Defendant John Blair, as a previous Attorney Trustee and Trustee to the Foundation, knew of the fiduciary duty owed by UBS to the Foundation.

160.    Defendant John Blair knew that UBS had already breached, and was continuing to breach, its fiduciary duties to the Foundation by refusing to transfer its assets to Wilmington Trust despite a lawful and unambiguous direction to do so by the authorized members of the Foundation.

161.    Defendant John Blair substantially assisted in this ongoing breach in several instances, to wit, by providing inaccurate information about his authority to act for the Trust to provide UBS with a colorable basis to refuse the directed asset transfer and by surreptitiously providing false information and/or documentation to support that refusal.

162.    Upon information and belief, defendant John Blair also substantially assisted in this ongoing breach by refusing to send the account termination and transfer instructions to UBS despite representing he would send those documents to UBS.

163.    The Trust has been damaged by UBS's breach and defendant John Blair's substantial assistance to UBS's breaches of its fiduciary duty.

164.     Defendant John Blair's substantial assistance damaged the Trust because his efforts improperly prevented, or gave UBS a flimsy pretext to prevent, the lawful and required transfer of the Trust's assets to Wilmington Trust and resulted in the Trust continuing to pay inflated advisory fees.

## COUNT FIVE
## NEGLIGENCE
### (as to Jay S. Blair)

165.     Plaintiffs repeat and reallege Paragraphs 1 through  109 as if fully set forth herein.

166.     At all times relevant hereto, defendant Jay S. Blair was the investment adviser representative to the Foundation.

167.     An investment adviser representative has a duty to handle a client's accounts and assets in a reasonably prudent manner.

168.     A reasonable, prudent investment adviser representative of a charitable trust with over $150 million in assets would regularly confirm the authority of Trustees and employees of the Trust to act on behalf of the Trust.

169.     Yet, despite the fact that he was under an obligations to periodically confirm the Foundation's affairs, operating procedures, and authorized persons, and despite knowing his father defendant John Blair was not the only Trustee and that he was removed in November 2020, defendant Jay Blair negligently failed to take any steps to verify defendant John Blair's authority to act on behalf of the Foundation.

170.     In failing to verify that defendant John Blair was authorized to act on behalf of the Foundation—especially upon receiving the Trust's directions to close the accounts—defendant Jay Blair failed to handle the Trust's accounts in a reasonably prudent manner.

24365591.2

171.    As a direct and proximate cause of this breach, the Trust was harmed by being obligated to pay UBS's and defendant Jay Blair's inflated and unreasonable advisory fees.

## COUNT SIX
## NEGLIGENCE – RESPONDEAT SUPERIOR
### (as to UBS)

172.    Plaintiffs repeat and reallege Paragraphs 1 through 109 as if fully set forth herein.

173.    The doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of his or her employment.

174.    Upon information and belief, at all times relevant to this Complaint, defendant Jay Blair was a Registered Investment Adviser, employee, and agent of his principal, UBS.

175.    An employee acts within the scope of his or her employment if the purpose in performing the at-issue actions is to further the employer's interests.

176.    In refusing to transfer the Trust's accounts, defendant Jay Blair acted within the scope of his employment with UBS because it furthered UBS's own interests in receiving investment advisory fees and retaining the largest amount of assets under management possible.

177.    Thus, UBS is liable for damages arising from defendant Jay Blair's negligence in managing the account.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs are entitled to and pray for judgment and relief as follows as to UBS:

A.      An order rescinding the UBS Relationship Agreement, the investment advisory contract, and any other agreement;

B.      Restitution in the amount of all payments made by the Foundation pursuant to the Relationship Agreement, investment advisory contract, or any other agreement;

C.  Punitive damages in an amount sufficient to punish and deter UBS from committing similarly egregious breaches of its fiduciary duty to its other clients, in an amount equal to all sums constitution restitution, but in any event not less than $10,000,000;

**WHEREFORE** Plaintiffs are entitled to and pray for judgment and relief as follows as to UBS and defendant Jay Blair:

D.  Damages for lost profits based on UBS's breaches of its fiduciary duties, loss of investment opportunity, and any other applicable damages in an amount to be determined at trial;

E.  Damages in an amount to be determined at trial attributable to defendant Jay Blair's negligence;

**WHEREFORE** Plaintiffs are entitled to and pray for judgment and relief as follows as to all Defendants:

F.  Plaintiffs' costs and attorneys' fees incurred in this action to the extent permissible under law; and

G.  Such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

**BARCLAY DAMON LLP**

By:  **/s/James P. Milbrand**

James P. Milbrand
Teresa M. Bennett
Nicholas DiCesare
The Avant Building
200 Delaware Avenue
Suite 1200
Buffalo, NY 14202
(716) 856-5500
jmilbrand@barclaydamon.com

34

John A. Brunjes (*pro hac vice forthcoming*)
545 Long Wharf Drive
New Haven, Connecticut 06511
(203) 672-2650
jbrunjes@barclaydamon.com

*Counsel for Plaintiffs Cynthia T. Doyle,
Mollie T. Byrnes, James Weiss and David
Welbourn, in their capacities as trustees of
The Peter and Elizabeth C. Tower
Foundation*

35

24365591.2