UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CYNTHIA T. DOYLE, MOLLIE T. BYRNES, JAMES
WEISS AND DAVID WELBOURN, IN THEIR
CAPACITIES AS TRUSTEES OF THE PETER AND
ELIZABETH C. TOWER FOUNDATION,

                                              Plaintiff,        Case No. 6:22-CV-276-FPG

v.

                                                           DECISION AND ORDER

UBS FINANCIAL SERVICES, INC., JAY S. BLAIR,
and JOHN N. BLAIR,

                                              Defendants.
_____

## INTRODUCTION

Plaintiffs Cynthia T. Doyle, Mollie T. Byrnes, James Weiss and David Welbourn ("Plaintiffs"), in their capacities as trustees of the Peter and Elizabeth C. Tower Foundation (the "Foundation"), bring this action against Defendants UBS Financial Services, Inc. ("UBS"), Jay S. Blair, and John N. Blair (collectively, "Defendants"), alleging violations of the Investment Advisers Act of 1940, 25 U.S.C. § 80b-1 *et seq*. (the "Act") and New York law. *See* ECF No. 1. Plaintiffs allege, *inter alia*, that UBS and Jay S. Blair breached their fiduciary duties to the Foundation in violation of the Act by failing to conduct due diligence with respect to John N. Blair's authority to maintain the Foundation's investment advisory accounts, and that John N. Blair "aided and abetted" that failure in violation of New York law. *Id*. Plaintiffs seek rescission of the investment advisory agreement UBS and Jay S. Blair executed with John N. Blair, restitution of all payments made pursuant to the agreement, compensatory damages, punitive damages, and attorneys' fees and costs. *Id*. at 24.[1]

---

[1] On May 11, 2022, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction. ECF No. 5. On May 20, 2022, the parties stipulated to an extension of Defendants' time to respond to Plaintiffs' motion *sine die*, or indefinitely, which the Court adopted on May 24, 2022. ECF Nos. 17, 19.

Plaintiffs allege that John N. Blair abused his authority as Attorney Trustee of the Foundation in connection with his management of the Foundation's investment advisory accounts. *Id*. As alleged, John N. Blair improperly caused the investment firm with which his son, Jay S. Blair, was affiliated to be appointed investment adviser of the Foundation and improperly transferred the Foundation's investment accounts to Morgan Stanley after Morgan Stanley purchased the firm with which Jay S. Blair was associated. *Id*. at 8-11. In addition, Plaintiffs allege John N. Blair improperly terminated Morgan Stanley and transferred the Foundation's investment accounts to UBS after Jay S. Blair and his team moved from Morgan Stanley to UBS. *Id*. at 12

On July 1, 2022, pursuant to the *Colorado River* abstention doctrine and Federal Rule of Civil Procedure 12(b)(6), John N. Blair moved to dismiss or stay Plaintiffs' complaint. ECF No. 22. On July 29, 2022, UBS and Jay S. Blair joined in John N. Blair's motion to dismiss and filed a brief to supplement the motion. ECF No. 25. On July 29, 2022, Plaintiffs responded. ECF No. 26. On August 12, 2022, John N. Blair replied. ECF No. 29. On January 26, 2023, the Court denied Defendants' motion to dismiss. ECF No. 31.

On March 10, 2023, UBS and Jay S. Blair (hereinafter, "Defendants"), moved to compel arbitration. ECF No. 31. On March 14, 2023, John N. Blair answered Plaintiffs' complaint. ECF No. 41. On April 7, 2023, Plaintiffs responded to Defendants' motion, ECF No. 44, and on April 21, 2023, Defendants replied. ECF No. 45. For the reasons set forth below, Defendants' motion to compel arbitration is denied.

**BACKGROUND**

The Foundation, a $147 million charitable trust, was created by Peter and Elizabeth C. Tower in the 1990s to support community organizations that serve children with learning

disabilities, mental health issues, and substance use disorders. ECF No. 1 at 6. From 2006 until 2020, John N. Blair served as Attorney Trustee of the Foundation and as a member of the Foundation's Operations and Investment Committees. *Id*. at 5. Blair was a voting member of each committee, along with Plaintiffs Doyle and Byrnes, daughters of Peter and Elizabeth. *Id*. at 8.

In May 2006, pursuant to the Amendment and Restatement of the Original Indenture dated May 9, 2006 (the "Fourth Indenture"), John N. Blair was appointed to the position of Attorney Trustee and became a member of the Investment Committee. *Id*. at 7-8. On August 2, 2006, the Investment Committee adopted a "Statement of Unanimous Consent in Lieu of Meeting of Voting Members of the Investment Committee" which authorized John N. Blair to "take any and all actions and execute any and all authorizations, instruments, documents and related material in connection with: 1. Writing Checks; 2. Directing the transfer, deposit, investment or disbursement of funds or other assets of the Foundation including […] all transactions to and from any and all accounts of the Foundation maintained at M&T Bank, Charles Schwab, Vanguard, Deutsche Bank and/or any successor account and/or new accounts at any banking or other financial institution[.]" *Id*. at 9; ECF No. 1-7 (the "2006 Consent"). In connection with the 2006 Consent, John N. Blair transferred the Foundation's investments to Smith Barney, an investment firm which was affiliated with the Arthurs Malof Group, Jay S. Blair's employer. ECF No. 1 at 9. Jay S. Blair is John Blair's son.

In May 2007, the Board of the Foundation implemented a Conflict of Interest Policy and a Self-Dealing Policy. *Id*. at 9-10; *see* ECF Nos. 1-8 (the "Conflict of Interest Policy"), 1-9 (the "Self-Dealing Policy"). The Conflict of Interest Policy provided that "[b]efore participating in any action or decision of the Foundation affecting any organization of which or in which a Foundation Trustee or employee, or any member of his or her family, is an officer, director, trustee

or employee or holds another responsible position, such person shall disclose such fact to the Board." ECF No. 1-8 at 2.  The Self-Dealing Policy provided that the "Foundation may not engage in any financial transaction with any Trustee or Foundation employee, except for the reimbursement of reasonable expenses incurred in carrying out the purposes of the Foundation and reasonable compensation for personal services rendered to the Foundation."  ECF No. 1-9 at 2.  The policy further provided that the "Foundation shall not engage in any transaction that will result in any material financial or personal benefit to any Trustee or Foundation employee."  *Id*.

The Investment Committee was "vested exclusively" with the "investment and management of the assets of the Foundation[,]" under the Seventh Amended and Restated Trust Indenture, and was governed by the Investment Committee Charter, which the voting members of the committee adopted on December 4, 2008.  *See* ECF No. 1-3 at 10 (the "Seventh Indenture"); *see also* ECF No. 1-10 (the "Charter").  The Charter provided that the "Investment Committee will be responsible for the investment and management of the assets of the Foundation[,]" and that "[a]ction of the Investment Committee shall require the vote or written consent (manual or electronic) of a majority of the voting Members of the Investment Committee except that unanimous vote or written consent of all of the voting members of the Investment Committee shall be required to amend, modify, change or waive any provisions of the Investment Policy Statement and/or the Investment Committee Charter."  ECF No. 1-10 at 3.  In addition, the Charter provided that the "Investment Committee shall have the power to retain and compensate one or more advisors to assist the Investment Committee in performing its responsibilities."  *Id*.

In 2009, Morgan Stanley purchased Smith Barney, causing Arthurs Malof to become affiliated with Morgan Stanley.  ECF No. 1 at 11.  John N. Blair transferred the Foundation's

4

investment advisory accounts to Morgan Stanley.  *Id*.  In 2015, the Arthurs Malof Group, led by Jay S. Blair, moved from Morgan Stanley to UBS.  *Id*. at 11-23.

On September 3, 2015, John N. Blair executed a Client Relationship Agreement (the "Agreement") with UBS in his capacity as Attorney Trustee, transferring the Foundation's assets and brokerage accounts from Morgan Stanley to UBS.  *Id*. at 12-14; ECF Nos. 39-3, 39-4 (signature pages to the Agreement).  The Agreement provided for arbitration before FINRA of "any controversy, claim or issue in any controversy that may arise … including but not limited to controversies, claims or issues in any controversy concerning any account, transaction, dispute or the construction, performance or breach of this Agreement or any other agreement."  ECF No. 39-3 at 42.  The Agreement further provided that the parties "are giving up the right to sue each other in court including the right to a trial by jury" and that "any arbitration under this Agreement shall be governed by the Federal Arbitration Act."  *Id*.  On the signature pages to the Agreement, John N. Blair marked "Yes" to a query as to whether "one trustee or officer [can] act independently …" "[i]f the trust has multiple trustees or officers," and, in signing the Agreement, indicated that as a trustee he had "full power under the trust agreement to make [the] Trust Certification and to submit valid orders and other instructions on behalf of the trust."  ECF No. 39-4 at 4.

On September 23, 2015, the Investment Committee adopted a "Statement of Unanimous Written Consent in Lieu of Meeting[,]" (the "2015 Consent") which "ratified and approved" John N. Blair's execution of documents "so that all investment advisory, consulting, brokerage, custodian services with respect to the assets and investments of the Tower Accounts be provided by [UBS] under such Client and/or Investment Management Agreements approved by John N. Blair[.]"  ECF No. 1-16 at 3.  The 2015 Consent further authorized John N. Blair to "make, execute and deliver the UBS Agreements[.]"  *Id*. at 4.

5

In June 2020, Plaintiffs Doyle and Byrnes, two of the three voting members of the Investment Committee, initiated the process of selecting an alternative investment advisor to replace UBS. ECF No. 1 at 15. In September 2020, a majority of the Investment Committee voted to terminate UBS and retain Wilmington Trust Investment Advisors, Inc. as the Foundation's investment advisor. *Id*. at 16; ECF No. 1-5 at 584. John N. Blair voted against such action, and objected to the transfer. ECF No. 1 at 16.

In November 2020, John N. Blair was removed as Attorney Trustee, after the Board of the Foundation adopted a resolution entitled "Unanimous Vote of the Disinterested Trustees of the Peter and Elizabeth C. Tower Foundation to Remove John N. Blair as Attorney Trustee." ECF No. 1-5 at 2. In January 2020, John N. Blair brought an action in Erie County Surrogate's Court challenging *inter alia* his removal in Erie County Surrogate's Court and seeking construction of the Foundation's governing documents to confirm the extent of his authority as Attorney Trustee. *See Doyle v. UBS Fin. Servs., Inc.*, No. 6:22-CV-276-FPG, 2023 WL 424488, at *1 (W.D.N.Y. Jan. 26, 2023); *see also Matter of P. & E. T. Found.*, 167 N.Y.S.3d 270, 271 (4th Dept. 2022), *rearg. denied*, 168 N.Y.S.3d 925 (2022).

On April 11, 2022, Plaintiffs brought the present action against Defendants UBS, Jay S. Blair, and John N. Blair. ECF No. 1. Plaintiffs (i) seek rescission of the investment advisory agreement John N. Blair executed with UBS as Attorney Trustee; (ii) allege that UBS and Jay S. Blair breached their fiduciary duties of care and loyalty to the Foundation under the Investment Advisers Act of 1940; (iii) allege that John N. Blair aided and abetted such breach under New York law; and (iv) allege negligence against UBS and Jay S. Blair. *Id*. at 24.

**LEGAL STANDARD**

Defendants contend that Plaintiffs' claims are subject to arbitration, and accordingly request an order compelling arbitration pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 2-4. Pursuant to the FAA, "[a] written provision in … a contract … to settle by arbitration a controversy thereafter arising out of such contract … or an agreement in writing to submit to arbitration an existing controversy arising out of … a contract … shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. "The FAA reflects a liberal federal policy favoring arbitration agreements, and places arbitration agreements on the same footing as other contracts." *Meyer v. Uber Techs.*, 868 F.3d 66, 73 (2d Cir. 2017) ( internal quotations and citations omitted). When deciding whether an action should be arbitrated, "first, [the Court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable […]." *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004).

"The question of whether the parties have agreed to arbitrate, i.e., the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "[T]he summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). Because the summary judgment standard is appropriate, "materials outside the pleadings may be considered." *Lobban v. Cromwell Towers Apartments, Ltd. P'ship*, 345 F. Supp. 3d 334, 342 (S.D.N.Y. 2018); *see also Meyer*, 868 F.3d at 74 (on a motion to compel arbitration, "the court consider[s] all relevant, admissible

evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with … affidavits, and draws all reasonable inferences in favor of the non-moving party." (alterations in original) (quotation and citation omitted)).

## DISCUSSION

Defendants move to compel arbitration on the basis that (i) an arbitration provision in the Agreement mandates that Plaintiffs claims should be submitted to arbitration and that (ii) such claims must be arbitrated before FINRA. ECF No. 39-1 at 10. Plaintiffs contend that arbitration cannot be compelled on three grounds: (i) the Agreement containing the arbitration provision was void *ab initio* because Defendant John N. Blair lacked authority to bind the Foundation to the Agreement; (ii) FINRA is not the appropriate forum; and (iii) Defendants waived their right to arbitrate by participating in this action. ECF No. 44 at 10-23. For the reasons below, the Court agrees that arbitration cannot be compelled under Plaintiffs' first argument. Because the Court denies Defendants' motion under Plaintiffs' first argument, the Court does not address the parties' remaining arguments.

### A. Arbitrability

As stated, Defendants move to compel arbitration under the FAA, arguing first that the Agreement is valid and enforceable. ECF No. 39-1 at 12-14. Plaintiffs argue that the Agreement was void *ab initio* because John N. Blair lacked actual or apparent authority to bind the Foundation to the Agreement, and Defendants knew or should have known this. ECF No. 44 at 16-18. For the reasons below, the Court concludes that Plaintiffs present sufficient evidence to place the validity of the Agreement at issue for trial. Accordingly, Defendants' motion is denied.

As a general matter, when "the making of the agreement to arbitrate is placed in issue … the court must set the issue for trial," so long as "the party putting the agreement to arbitrate in issue ... present[s] 'some evidence' in support of its claim." S*phere Drake Ins., Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001) (quoting *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir.1972)).  Indeed, "[i]f there is a disputed question of material fact, such that "the making of the arbitration agreement ... [is] in issue," then "the court shall proceed summarily to the trial thereof."  9 U.S.C. § 4; *see Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  "Depending on the type of claimed inarbitrability," a party might also be "required to make a specific challenge to the arbitration clause."  *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 407 (2d Cir. 2009); *see Sphere Drake*, 263 F.3d at 31-32 (noting that in setting an arbitrability issue for trial, a party alleging that a contract is void need not challenge the arbitration clause, but a party alleging that a contract is voidable must challenge the arbitration clause in particular).[2]

Where parties are bound to an arbitration agreement, courts favor arbitration as a form of dispute resolution.  *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022); *see* 9 U.S.C. § 2; *see also New York v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996).  "But on the antecedent question of whether the parties actually agreed to arbitration (that is, whether an arbitration agreement between them exists at all)," courts show no such special solicitude.  *Barrows*, 36 F.4th at 50 (citing *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003).  Courts resolve such agreement-formation questions by applying the law of the state at

---

[2] Defendants' reliance on *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006) is misplaced.  *See* ECF No. 39-1 at 13-14 ("the validity of the Client Relationship Agreement must go to the arbitrator.").  While *Buckeye* held that an arbitration provision may in some circumstances be severable from an agreement otherwise challenged as void, *Buckeye* expressly stated that it "does not speak to the issue decided in cases […] which hold that it is for courts to decide whether the alleged obligor ever signed the contract [or] *whether the signor lacked authority to commit the alleged principal.*"  *Buckeye*, 546 U.S. at 444 n. 1 (emphasis added).  This action presents the latter question.

issue. *Id*. (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)). "Under New York law, parties that have not agreed to arbitrate claims may not be forced to do so." *Id*. (citing *TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335 (1998); *Marlene Indus. Corp. v. Carnac Textiles, Inc.*, 45 N.Y.2d 327 (1978)).

To that end, "[i]f an agent that has been charged with negotiating a contract on behalf of the principal acts outside the scope of its agency, and the opposing party knows this, then the agent lacks both actual and apparent authority, and the principal is not bound to the contract, for the contract is void—it never came into legal existence." *Sphere Drake*, 263 F.3d at 32 (citing *Scientific Holding Co. v. Plessey Inc*., 510 F.2d 15, 24 (2d Cir. 1974)).

"Under New York law, an agent has apparent authority if 'a principal places [the] agent in a position where it appears that the agent has certain powers which he may or may not possess.'" *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 411 (2d Cir. 2009) (quoting *Masuda v. Kawasaki Dockyard Co*., 328 F.2d 662, 665 (2d Cir. 1964)); *see, e.g., Warnock Cap. Corp. v. Hermitage Ins. Co*., 21 A.D.3d 1091 (2d Dep't 2005). Actual authority "is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." *Dinaco, Inc. v. Time Warner, Inc*., 346 F.3d 64, 68 (2d Cir. 2003) (quoting *Minskoff v. Am. Express Travel Related Servs. Co*., 98 F.3d 703, 708 (2d Cir. 1996)).

In sum, "[i]f a party alleges that a contract is void and provides *some evidence* in support, then […] the party is entitled to a trial on the arbitrability issue […]." *Sphere Drake*, 263 F.3d at 32 (emphasis added). Here, Plaintiffs allege that the Agreement was void *ab initio* because John N. Blair was not authorized to bind the Foundation to it. *See* ECF No. 1 at 12-14; ECF Nos. 39-3, 39-4; ECF No. 44 at 16-18. Accordingly, to defeat Defendants' motion, Plaintiffs must present

10

"some evidence … to substantiate [their] denial" that an agreement had been made. *Barrows*, 36 F. 4th at 50 (citing *Interocean*, 462 F.2d at 676 (2d Cir. 1972) (to create a genuine issue for trial, a nonmovant must make an unequivocal denial and substantiate it with some evidence)); *accord Sphere Drake*, 263 F.3d at 30.

At this stage of litigation, and "draw[ing] all reasonable inferences in favor of the non-moving party[,]" the Court concludes that Plaintiffs present sufficient evidence to substantiate their denial of the Agreement's validity. *Meyer*, 868 F.3d at 74. A triable issue exists as to whether John N. Blair lacked actual and apparent authority to execute the Agreement at the time of its execution, and whether Defendants knew or should have known this. *See Sphere Drake*, 263 F.3d at 32. To substantiate their denial, Plaintiffs rely primarily upon the terms of the Seventh Indenture and the Investment Committee Charter, the latter of which the voting members of the committee adopted on December 4, 2008. *See* ECF No. 1-3 at 10 (the "Seventh Indenture"); *see also* ECF No. 1-10 (the "Charter"). As stated, the Seventh Indenture provided broadly that the Investment Committee was "vested exclusively" with the "investment and management of the assets of the Foundation[,]" and the Charter likewise provided that the "Investment Committee will be responsible for the investment and management of the assets of the Foundation[,]" and "[a]ctions of the Investment Committee shall require the vote or written consent (manual or electronic) of a majority of the voting Members of the Investment Committee […]." ECF No. 1-10 at 3. The Charter additionally stated that the "Investment Committee shall have the power to retain and compensate one or more advisors to assist the Investment Committee in performing its responsibilities." *Id*.

While the 2006 Consent, as discussed, appears to have authorized John N. Blair's execution of an investment relationship with Smith Barney, then-affiliate of Jay S. Blair, Plaintiffs argue that

11

the Charter "superseded" the 2006 Consent such that any authority bequeathed to John N. Blair under the 2006 Consent was abrogated, and that Defendants knew or should have known this. ECF No. 1 at 13. Specifically, the 2006 Consent authorized John N. Blair to, in pertinent part, "take any and all actions and execute any and all authorizations, instruments, documents and related material in connection with […] [d]irecting the transfer, deposit, investment or disbursement of funds or other assets of the Foundation including […] all transactions to and from any and all accounts of the Foundation maintained at M&T Bank, Charles Schwab, Vanguard, Deutsche Bank and/or any successor account and/or new accounts at any banking or other financial institution[.]" ECF No. 1-7. The 2006 Consent and the Charter, adopted in 2008, each include broad terms authorizing John N. Blair and the Investment Committee, respectively, to take a range of investment-related actions in a manner which appears to be in conflict, such that a reasonable trier of fact could conclude that John N. Blair lacked authority to bind the Foundation to the Agreement when he independently executed it on September 3, 2015. A reasonable trier of fact may, for instance, conclude that the Charter exclusively authorized the Investment Committee to oversee investment actions in a manner which precluded John N. Blair's execution of the Agreement. *See* ECF No. 1-10. Likewise, a jury could conclude that the 2006 Consent was intended only to authorize John N. Blair to "write checks" and transfer funds subject to the Investment Committee's approval. ECF No. 1-7 (authorizing Attorney Trustee to take any and all actions […] in connection with […] writing checks). Such questions, and the express terms of the 2006 Consent and Charter, suffice to place the "making of the agreement to arbitrate" at issue, and suggest that the Court must "set the issue for trial." *Sphere Drake*, 263 F.3d at 32. Whether the Charter in fact superseded the 2006 Consent, as Plaintiffs contend, constitutes a genuine dispute of material fact as to the extent of John N. Blair's authority to execute the Agreement on the Foundation's behalf.

While John N. Blair's representation that he was authorized to act independently when executing the Agreement, *see* ECF No. 39-4 at 4 (Attorney Trustee indicating that he has full power to execute agreement), hints at a finding that he possessed apparent authority to execute the Agreement, it is well-settled that an agent has apparent authority only if the "*principal* places [the] agent in a position where it appears that the agent has certain powers which he may or may not possess." *Telenor Mobile Commc'ns AS*, 584 F.3d at 411 (emphasis added) (internal quotation marks omitted).  Here, Defendants do not present sufficient evidence to suggest that the principal, the Foundation, placed John N. Blair, its agent, in such a position prior to the execution of the Agreement on September 3, 2015.  Defendants appear to cite only the 2006 Consent for support, which, as Plaintiffs adequately allege, may have been superseded by the Charter in 2008.  Without more, the Court cannot conclude that John N. Blair had apparent authority to execute the Agreement.

With respect to whether Defendants knew or should have known of this, as is required, the evidence adduced by Plaintiffs is thin, but sufficient to pass muster under *Barrows* and *Sphere Drake*.  Plaintiffs allege that Jay S. Blair's involvement with the Foundation since 2006 amounts to "some evidence" that he and UBS knew or should have known John N. Blair may have lacked authority to bind the Foundation to the Agreement.  *See* ECF No. 44 at 18-19.  The Court finds that Plaintiffs' allegations, which are largely undisputed, as to Jay S. Blair's longstanding involvement with the Foundation over approximately nine years prior to the execution of the Agreement are sufficient to place the making of the agreement to arbitrate at issue.  *See Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019) ("[P]laintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact."); *see also Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("[W]hen an agent is employed to represent a principal with respect

13

to a given matter and acquires knowledge material to that representation, for purposes of assessing the principal's rights and liabilities vis-à-vis a third person the agent's knowledge is imputed to the principal.").

The 2015 Consent, which ostensibly ratified the Agreement, looms large over this discussion, but ultimately does not disturb the Court's conclusion that Plaintiffs have adequately alleged, at this stage, that the Agreement was void *ab initio*.  As stated, the 2015 Consent, which was adopted by the Investment Committee (which included Plaintiffs Doyle and Byrnes) twenty days after John N. Blair executed the Agreement with UBS, expressly "ratified and approved" the Agreement.  ECF No. 1-16 at 3.  Specifically, the 2015 Consent approved John N. Blair's prior execution of documents "so that all investment advisory, consulting, brokerage, custodian services with respect to the assets and investments of the Tower Accounts be provided by [UBS] under such Client and/or Investment Management Agreements approved by John N. Blair[.]" *Id*.  The 2015 Consent further authorized John N. Blair to "make, execute and deliver the UBS Agreements[.]" *Id*. at 4.  The 2015 Consent, which appears to be clear and unequivocal in its post hoc approval of John N. Blair's purportedly brazen and unauthorized actions, ultimately does not impact the Court's arbitrability determination.  While the 2015 Consent may constitute evidence from which a trier of fact may determine the extent of John N. Blair's authority and liability at trial, for the purposes of the present motion, Plaintiffs need only present "some evidence … to substantiate [their] denial" that an agreement had been made.  *Barrows*, 36 F. 4th at 50.  As discussed, that burden has been met.  Moreover, though Defendants do not raise it, the Court need not address a possible ratification defense stemming from the consent because such a defense is

14

(i) foreclosed by Federal Rule of Civil Procedure 8(c) at this juncture, and (ii) ostensibly inapplicable to contracts which are adequately alleged to be void, as explained below.[3]

First, Federal Rule of Civil Procedure 8(c) provides: "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." "The rule is intended to notify a party of the existence of certain issues, and its mandatory language has impelled [the Second Circuit] to conclude that a party's failure to plead an affirmative defense bars its invocation at later stages of the litigation." *Doubleday & Co. v. Curtis*, 763 F.2d 495, 503 (2d Cir. 1985) (citing *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984). "Ratification is an affirmative defense within the purview of that rule." *Principal Life Ins. Co. v. Locker Grp.*, 869 F. Supp. 2d 359, 366 (E.D.N.Y. 2012) (citing *Spyder Enters., Inc. v. Ward*, 872 F. Supp. 8, 13 (E.D.N.Y. 1995) (defendant "never asserted a ratification defense in his pleadings, and as that is an affirmative defense, he was bound to have given notice of his intention to assert this defense in his pleadings.").

Defendants do not expressly or impliedly assert ratification in the present motion or reply brief, nor did they in their supplemental brief brought in connection with the Defendant John N. Blair's prior motion to dismiss. *See e.g.*, ECF Nos. 25, 39, 45. Compelling arbitration, and dismissing Plaintiffs' claims as to Defendants, "based on an issue never pleaded by [Defendants]—or even implicitly raised […]—is inconsistent with the due process concerns of adequate notice and an opportunity to be heard." *Doubleday & Co.*, 763 F.2d at 502 (explaining that "such a result runs counter to the spirit of fairness embodied in [Rule 8(c)]").

---

[3] Under New York law, if, "a party later claiming the right to rescind has continued to accept the benefits of the agreement or acted in some other fashion inconsistent with exercise of a right to rescind," that party will be deemed to have waived the misrepresentations and ratified the agreement. *Prudential Ins. Co. of Am. v. BMC Indus., Inc.*, 630 F. Supp. 1298, 1300 (S.D.N.Y. 1986). Ratification requires clearly established intent, and "may not be inferred from doubtful or equivocal language." *Am. Gen. Life Ins. Co. v. Salamon, et al.*, No. 09–cv–5428, 2011 WL 976411, at *4 (E.D.N.Y. March 6, 2011).

15


Second, even if Defendants had raised ratification as an affirmative defense, the Court is not convinced that it would succeed because Plaintiffs have adequately alleged that the contract was void *ab initio*, not merely voidable, as Defendants appear to contend in their reply brief. *See* ECF No. 45. "It is a generally accepted principle that a *voidable* contract can be cured by ratification[.]" *Brown v. City of S. Burlington, Vt.*, 393 F.3d 337, 343 (2d Cir. 2004) (emphasis added) (citing 17A Am. Jur .2d Contracts § 11 (2004)).  However, a party's claim that a "contract is *void* nullifies all aspects of the agreement […] giving neither party the power to ratify or disaffirm its provisions." *Romero v. Allstate Ins. Co.*, 143 F. Supp. 3d 271, 281-82 (E.D. Pa. 2015) (internal quotation marks omitted) (citing 6 Restatement (Second) of Contracts § 7 cmt. a ("[A void contract] is not a contract at all."); *see Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 107-09 (3d Cir. 2000) (explaining distinction between void and voidable contracts where making of an arbitration agreement in dispute).  Accordingly, it is generally recognized that "a voidable contract may be ratified, while a void contract may not." *Allen v. Holiday Universal*, 249 F.R.D. 166, 172 (E.D. Pa. 2008) (emphasis in original).

Accordingly, at this stage of litigation, and "draw[ing] all reasonable inferences in favor of the non-moving party[,]" the Court concludes that Plaintiffs present sufficient evidence to substantiate their denial of the Agreement's validity and create a triable issue of fact with respect to whether John N. Blair lacked authority to execute the Agreement.  *Meyer*, 868 F.3d at 74. Because, as a general matter, "parties that have not agreed to arbitrate claims may not be forced to do so[,]" Defendants' motion to compel arbitration is denied.  *Barrows*, 36 F.4th at 50.

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is DENIED.

IT IS SO ORDERED.

Dated: February 23, 2024
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York